## STATE v. MERLYN C. BILLINGTON.[1]

March 4, 1949.

No. 34,731.

[1]Reported in 36 N. W. (2d) 393.

*Marshall S. Snyder,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, and *Carl G. Buck, Jr.,* County Attorney, for the State.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment and sentence of the district court.

Defendant was charged in an information with the crime of giving a check to one F. W. Disse without funds or credit, with intent to defraud. Defendant demurred to the information, which demurrer was overruled. Defendant then demanded a bill of particulars, which was granted. He was tried before a jury, convicted, and sentenced.

Defendant was the owner of the Roy Lake Timber Company and operated two small lumber mills in the vicinity of Detroit Lakes, one a logging mill at Roy Lake and the other a planing mill at Boot Lake. Defendant employed one Eugene LeRoy Adams to operate the mills and supervise activities. In order to make it possible for Adams to pay the wages of employes at the mills and purchase supplies, defendant opened a checking account at the Fifth

Northwestern National Bank of Minneapolis on August 16, 1946, under the name of the Roy Lake Timber Company, and executed a power of attorney to Adams to draw checks on the account. The power of attorney was in full force and effect from August 16 until the time of trial, according to the testimony of Adams.

Disse testified that he first met defendant about September 1, 1946, when he and Adams came into Disse's oil station; that defendant told him he had purchased the Roy Lake Timber Company and that he was putting Adams up there to operate it as his agent; that Adams would be authorized to buy merchandise and pay bills; and that, inasmuch as he had learned that Disse had previously supplied the mill with satisfactory merchandise, defendant would like to continue to do business with him. Disse said that he replied to the effect that he would be pleased to do business with him provided it was on a cash basis, which he claims was satisfactory to defendant. Disse further testified that pursuant to this understanding he proceeded to sell merchandise, consisting of petroleum products, to the Roy Lake Timber Company, although it was not always on a cash basis. Although the orders were placed by Adams, Disse claims that none of the merchandise was sold to Adams, but that all of it was sold to the Roy Lake Timber Company. It developed, according to Disse's testimony, that, although some of the merchandise delivered after the September conversation had been paid for, the timber company owed Disse $440.85 on November 22, 1946, for petroleum products delivered previous to that date. He says that shortly before November 22 he issued instructions to his employes not to sell or deliver any more petroleum products to the timber company until the $440.85 had been paid.

Defendant claims that the first conversation he had with Disse was about October 1, 1946; that they discussed the possible sale of some pulpwood to Disse, but that they did not agree on a price, and that during this conversation Disse said that he was supplying some merchandise to the Roy Lake mill. Defendant testified that he replied, "that is fine, Mr. Disse, provided it is on a cash basis."

Adams appears to have also understood that it was to be on a cash basis, as he testified in part:

"Q. You understand that this account with Mr. Disse was to be on a cash basis?

"A. It was supposed to be on a cash basis, yes; supposed to pay for it when received at the mill; often I wasn't at the mill when the fuel reached there and delivered its load and usually the men would sign for it, and a couple of days later if I dropped in this town of Detroit Lakes I would pay Mr. Disse."

Adams also said that defendant owned the mill and that he had authority from the latter to purchase supplies in connection with its operation and to sign checks, as defendant's agent, issued by the timber company. He further testified that on or about November 21, 1946, he went to Minneapolis from the logging camp for the purpose of conferring with defendant concerning the bank's failure to honor some Roy Lake Timber Company wage checks which had been given by Adams to the employes of the timber company early. in November. In connection with this Minneapolis conference with defendant, Adams said in part:

"* * * I told him, Mr. there is some checks that came back and that is not good in this country; well, he says I got some lumber out here that has got to be unloaded and sold and this and that and we got the money, and he says it will be taken care of; well, I says, boy, it better be, it isn't healthy up there checks come back in that country, and so I asked him if I go up there and send them back in, he said yes you do that, you go back up there and have those checks sent back in and I will have some money in the bank; and I said another thing, I have a gas bill at Disse, I have to pay that, and I told him about how much that would be; he said that stuff has got to be taken care of, I says that is right, can I go back up there and straighten this out and send the checks in, he said you do that and I will take care of it."

With further reference to the Disse bill, Adams testified as follows:

"Q. Is that the time you claim you told him [defendant] about this Disse account?

"A. I told him it had to be paid, yes.

"Q. That is when you talked to him about it?

"A. Yes.

"Q. And you told him you could not get any more merchandise until you paid that bill?

"A. *I guess so; they did not say I could not but I knew that I had so much then that they don't usually make it a practice of giving a person too much.*" (Italics supplied.)

Defendant claims that he had not conferred with Adams for some time prior to November 22, 1946, and that he had requested him not to write any more checks. Margaret Arnold, another of defendant's employes, also testified that Adams had been requested from time to time, and particularly during the deer-hunting season that year (stipulated as being from November 16 to 24), to turn in the checkbook.

With reference to Adams' testimony, defendant said in part:

"Q. * * * did you hear Mr. Adams testify that he come and told you that they had an account with Mr. Disse, did you hear him say that in court?

"A. That he had an account?

"Q. He came down to Minneapolis and told you there was an account with Mr. Disse that wasn't paid, you heard him say that?

"A. Yes, I did.

"Q. And he told you that you have to pay the account before he could get any more merchandise, you heard him say that?

"A. Yes.

"Q. And you heard him say you told him to write a check for the amount, you heard him say that?

"A. Yes.

"Q. You say anything like that to him?

"A. I did not.

"Q. At any time?

"A. I did not."

In any event, it appears from the record that Adams returned to Detroit Lakes on November 22, 1946, with one Pabelon, a book-keeper for defendant, who Adams claims was sent by defendant to figure certain employes' time, issue the face amount of checks before Adams signed them, and report generally to defendant. On November 22, Adams delivered the check referred to in the information to Walter Wilke, an employe of Disse, at the latter's place of business in Detroit Lakes. The check was payable to F. W. Disse for $440.85, the amount he claimed was owing him by the timber company for merchandise sold and delivered to it prior to that date. The check was not honored when presented to the bank upon which it was drawn.

Adams testified that after delivering this check, and on the same date, he told Wilke, in charge of Disse's oil station at the time, that he needed some more fuel out at one of the mills, and that the oil station employes made delivery of additional petroleum supplies to the mill within a few days afterward. When asked if he gave the check so that he could get more fuel to operate the Roy Lake camp, Adams replied, "I gave that check to pay for what fuel and oil I had received." The bill for this and additional fuel had not been paid at the time of the trial.

The information charging the crime committed reads as follows:

"I, Carl G. Buck, Jr., County Attorney for said county, hereby inform the court that on the 22nd day of November, in the year A. D. 1946, at said county, Bill Billington did commit the crime of giving a check without funds or credit in this, to-wit: that the said Bill Billington, then and there being, did wilfully, unlawfully and with intent to defraud, make, draw, utter and deliver unto F. W. Disse his certain check upon the Fifth Northwestern National Bank of Minneapolis, Minnesota, then and there a banking corporation conducting a general banking business at Minneapolis, Minnesota, said check being in the words and figures as follows:

"Roy Lake Timber Co.                                    No. 1224
"Timber Land and Stumpage
  "Minneapolis, Minnesota, Nov. 22, 1946.
"Pay to the order of F. W. Disse . . . . . . . . . . $440.85
Four hundred and forty 85/100 . . . . . . . . . . Dollars
                         "Roy Lake Timber Company
                         "By Eugene LeRoy Adams
"5th Northwestern National Bank
  Minneapolis 8, Minnesota
"That at the time of such making, uttering and delivering, he the
said Bill Billington as he then and there well knew, did not have
sufficient funds in or credit with the said bank for the payment of
such check upon its presentation, against the form of the statute
in such cases made and provided and against the peace and dignity
of the State of Minnesota.
  "Dated October 21st, 1947.
                         "Signed: Carl G. Buck, Jr.,
                               "County Attorney."

It is apparent from the record that defendant either was involved
in too many business ventures or was operating on a close financial
margin, as he seems to have been in difficulty from time to time
with his bank in Minneapolis in connection with overdrafts. This
necessitated occasional switching of funds from one account to an-
other in the Minneapolis bank where he was doing business. It is
also evident from the record that he had been admonished by em-
ployes of the bank with reference to overdrafts in the Roy Lake
Timber Company account and that the situation had become so
acute that the bank refused to honor some wage checks for certain
employes above referred to. While we are not convinced by defend-
ant's explanation of some of his business activities, we are com-
pelled here to review the record for the purpose of determining
whether there was evidence in the instant case to prove beyond a
reasonable doubt that he was guilty of the crime charged in the in-

formation, to wit, that of giving a check to one F. W. Disse, without funds or credit, with intent to defraud.

The principal questions for consideration here are (1) whether the trial court of Becker county had jurisdiction to try defendant; (2) whether the court erred in instructing the jury; and (3) whether the check in question was given without funds or credit with intent to defraud.

■ We answer the first question in the affirmative. This case is controlled by M. S. A. 627.01, which provides that every criminal cause shall be tried in the county where the offense was committed. If there was any crime committed in the case at bar, it was in Becker county, as that was the place where the check was delivered to Disse and where Disse was located. He was the party who suffered the loss in the instant case and the one who had reason to complain if defendant intended to defraud him when he delivered the check for $440.85 through his agent, Eugene LeRoy Adams. State v. Scott, 190 Minn. 462, 252 N. W. 225.

If any crime was committed, defendant was the principal, even though Adams delivered the check. The state took the position at the trial, from the evidence it had, that there had been no criminal offense committed by Adams; that he was regarded by the state as an agent; and that all the evidence indicated that Adams was working for defendant and doing what he was authorized to do.. Section 610.12 defines a principal concerned in the commission of a crime as follows:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission and whether present or absent, and every person who directly or indirectly counsels, encourages, hires, commands, induces, or otherwise procures another to commit a crime, is a principal, and shall be indicted and punished as such."

"Where a person procures the commission of a crime in one county through the agency of an innocent person, he is a principal and indictable in the county where the crime was committed, al-

though he was not in such county at the time of its commission." 22 C. J. S., Criminal Law, § 183.

■ We can find no reversible error in connection with the court's charge to the jury. It appears to us that the trial court made a painstaking effort to instruct the jury properly in connection with defendant's rights under the law.

■ The troublesome question before us is whether the record sustains the verdict of the jury that defendant was guilty of the crime charged in the information. The original transcript of testimony filed herein is voluminous and contains many superfluous and immaterial matters, although the case seems to have been well prepared and tried by the state. It does not appear to us, however, after carefully examining the testimony, that the evidence is sufficient to justify the verdict of the jury.

Defendant was charged with a serious crime—a gross misdemeanor involving a prison sentence and a fine upon conviction. He was presumed to be innocent until found guilty. In order for him to be guilty of the crime charged in the information, it was necessary for the state to prove beyond a reasonable doubt that defendant, with intent to defraud Disse, instructed Adams, as his agent, not only to deliver the $440.85 check, knowing that he had no funds in the bank with which to meet it when presented, but also for the purpose of getting credit for additional merchandise, which defendant must have instructed Adams to purchase from Disse.

Even though we were to disregard defendant's testimony denying that he told Adams to write a check to cover the Disse account, we still cannot find other testimony in the record that shows beyond a reasonable doubt that defendant told Adams to go back to Detroit Lakes and give Disse a check for $440.85 to cover the old account and at or about the same time to order more merchandise from Disse. Even Adams does not say that defendant told him to order more petroleum supplies from Disse when he claims that defendant told him to go back to Detroit Lakes and "straighten" out the Disse account. The nearest Adams came to the matter was when he

testified, in answer to a question whether he told defendant that he could not get any more merchandise from Disse until he paid that bill, "I guess so; they did not say I could not but I knew that I had so much then that they don't usually make it a practice of giving a person too much."

It is true, if we are to believe the testimony of Adams in connection with the meeting he claims to have had with defendant in Minneapolis on November 21, 1946, that he might have inferred that if defendant was instructing him to go back and carry on with the lumbering operations and also to give Disse a check to cover the $440.85 account that this might also be an inferential instruction from defendant to order more supplies from Disse. We do not believe that such an inference would be sufficient to sustain the conviction of defendant in the instant case, especially in view of defendant's denial of such instructions and in view of Adams' uncertainty when he said he guessed he told defendant that he could not get more merchandise from Disse until the account was paid. He appears to have come to that conclusion, according to his testimony, not from anything the operators of the oil station told him, but from his general knowledge "that they don't usually make it a practice of giving a person too much."

While we do not condone some of defendant's business practices as shown by the record, we are compelled to say here that the evidence does not sustain the verdict of the jury. Reversed with directions to discharge defendant.

So ordered.